**Nos. 15-2145(L), 15-2147**

---

**In The**
**UNITED STATES COURT OF APPEALS**
**For The Fourth Circuit**

---

United States of America *ex rel.*
Brianna Michaels and Amy Whitesides,

*Plaintiffs-Appellants,*

v.

Agape Senior Community, Inc.; *et al.*

*Defendants-Appellees,*

v.

United States of America,

*Intervenor-Appellee*

---

**NON-CONFIDENTIAL**
**OPENING BRIEF OF DEFENDANTS-APPELLEES**
**AGAPE SENIOR COMMUNITY INC., *ET AL.***

---

Deborah B. Barbier
Deborah B. Barbier Attorney at
Law
1531 Laurel Street
Columbia, SC 29201
803.445.1032
dbb@deborahbarbier.com

William W. Wilkins
Kirsten E. Small
Mark C. Moore
William C. Lewis
Nexsen Pruet, LLC
Post Office Drawer 10648
Greenville, SC 29603
(864) 370-2211
BWilkins@nexsenpruet.com
KSmall@nexsenpruet.com

*Counsel for Defendants-Appellees*
*Agape Senior Community Inc., et al.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

JURISDICTIONAL STATEMENT .................................................................. 1

ISSUE PRESENTED FOR REVIEW ............................................................. 2

INTRODUCTION ............................................................................................... 3

STATEMENT OF THE CASE .......................................................................... 5

    A.  The Medicare Hospice Benefit. ..................................................... 5

    B.  Relators' Allegations. ........................................................................ 7

    C.  Filing, Investigation, and Dismissal of *Rush* Complaint. ............... 8

    D.  The Statistical Sampling Issue ....................................................... 9

    E.  Settlement and Government Veto. ................................................ 10

SUMMARY OF ARGUMENT ......................................................................... 14

ARGUMENT ....................................................................................................... 16

  I.  Standard of Review ............................................................................... 16

  II.  Section 3730(b)(1) does not give the Government absolute and unreviewable authority to veto a settlement in a declined *qui tam* action. ................................................................................................ 16

    A.  Statutory History .............................................................................. 21

    B.  Properly construed, § 3730(b)(1) does not give the Government an unreviewable right of veto over *qui tam* settlements. ............................................................................... 22

    C.  The goals of the FCA can be accomplished without giving the Government unlimited veto authority ...................................... 25

CONCLUSION ................................................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*BankAmerica Corp. v. United States,*
  462 U.S. 122 (1983)..................................................................................... 26

*Dep't of Revenue v. ACF Indus., Inc.,*
  510 U.S. 332 (1994)..................................................................................... 23

*Etape v. Chertoff,*
  497 F.3d 379 (4th Cir. 2007)........................................................................ 22

*Flinn v. FMC Corp.,*
  528 F.2d 1169 (4th Cir. 1975)...................................................................... 26

*King v. Burwell,*
  135 S. Ct. 2480 (2015) ................................................................................. 23

*Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist.,*
  921 F.2d 1371 (8th Cir. 1990)...................................................................... 26

*O.S. v. Fairfax County Sch. Bd.,*
  804 F.3d 354 (4th Cir. 2015)........................................................................ 16

*R.H. Donelley Corp. v. United States,*
  641 F.3d 70 (4th Cir. 2011) .......................................................................... 23

*Searcy v. Philips Electronics of N. Am. Corp.,*
  117 F.3d 154 (5th Cir.1997).................................................................. passim

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forests Assocs., Ltd.,*
  484 U.S. 365 (1988)..................................................................................... 23

*United States ex rel. Colorado v. Rocky Mountain Gastroenterology Assocs., PLLC,*
  2015 WL 3494501 (D. Colo. June 2, 2015) ................................................. 26

*United States ex rel. Fender v. Tenet Healthcare Corp.,*
  105 F. Supp. 2d 1228 (N.D. Ala. 2000)....................................................... 18

*United States ex rel. Hullinger v. Hercules, Inc.,*
  80 F. Supp. 2d 1234 (D. Utah 1999)............................................................ 18

*United States ex rel. Killingsworth v. Northrop Corp.,*
  25 F.3d 715 (9th Cir.1994)............................................................... 16, 17, 18

*United States ex rel. Law v. Spurlock,*
  582 F. Supp. 2d 1350 (N.D. Ala. 2008)....................................................... 27

*United States ex rel. Luciano v. Pollack Health & Wellness, Inc.,*
  2015 WL 2168655 (D.N.J. Apr. 30, 2015) .................................................. 27

*United States ex rel. McLain v. Flour Enters., Inc.*,
2013 WL 3899889 (E.D. La. July 29, 2013) ........................................ 27

*United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.*,
961 F.2d 46 (4th Cir. 1992) ................................................. 16, 25

*United States ex rel. Osheroff v. MCCI Group Holdings, LLC*,
2013 WL 3991964 (S.D. Fla. Aug. 2, 2013) ....................................... 18

*United States ex rel. Radcliffe v. Purdue Pharma, LP*,
600 F.3d 319 (4th Cir. 2010) .............................................3, 14, 20

*United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v Provident Life and Acc. Ins. Co.*,
811 F. Supp. 346 (E.D. Tenn. 1992) ............................................ 18

*United States ex rel. Summit v. Michael Baker Corp.*,
40 F. Supp. 2d 772 (E.D. Va. 1999) ........................................... 14

*United States v. Health Possibilities P.S.C.*,
207 F.3d 335 (6th Cir. 2000) .............................................19, 20, 25

**Statutes**

28 U.S.C. § 1292(b) ........................................................... 1

28 U.S.C. § 1331 .............................................................. 1

31 U.S.C. § 3729(a)(1) ........................................................ 3

31 U.S.C. § 3730 .........................................................passim

42 U.S.C. § 1395f(a)(7)(A)(i) ............................................... 5, 6

42 U.S.C. § 1395x(dd)(3)(A) ................................................... 5

Act of March 2, 1863, § 4, 12 Stat. 696, 698 (1863) ......................... 21

Pub. L. No. 78-213, § 3491, 57 Stat. 608 (1943) ............................. 21

Pub. L. No. 99-562, § 3, 100 Stat. 3513, 3514 (1986) ........................ 22

**Other Authorities**

Charles Doyle, *Qui Tam: The False Claims Act and Related Federal Statutes*, Cong. Res. Serv. (Aug. 6, 2009) ........................................ 21

Ctr. for Medicare & Medicaid Servs.,
Medicare Benefit Policy Manual Ch. 9 ......................................6, 7

Kenny Rogers, *The Gambler*, *on* THE GAMBLER (United Artists 1978) ........................... 24

Model Rules of Prof'l Conduct R. 1.2(a) ..................................... 24

## Rules

Fed. R. App. P. 5(a)(2) ................................................................ 1

Fed. R. Civ. P. 12(b)(6) ........................................................... 23

Fed. R. Civ. P. 56(c) ................................................................ 23

## JURISDICTIONAL STATEMENT

This action was brought pursuant to the *qui tam* provision of the False Claims Act, 31 U.S.C. § 3730. Accordingly, the district court had federal question jurisdiction. *See* 28 U.S.C. § 1331.

On June 25, 2015, the district court entered an order certifying two questions for interlocutory review pursuant to 28 U.S.C. § 1292(b). J.A. 468-486. Plaintiffs-Appellants and Defendants-Appellees each filed a timely petition for permission to appeal on July 7, 2015. *See* 28 U.S.C. § 1292(b); Fed. R. App. P. 5(a)(2). This Court consolidated the petitions and thereafter granted both petitions. This Court has jurisdiction pursuant to 28 U.S.C. § 1292(b).

## ISSUE PRESENTED FOR REVIEW

I.    Does the Government, in a *qui tam* action in which it has declined to intervene, have an absolute and unreviewable right to veto the settlement negotiated by the parties, or is the Government's objection to the settlement subject to review for reasonableness?

## INTRODUCTION

This case arises under the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), which imposes civil liability on any person who knowingly presents a false claim for payment to the United States. *See* 31 U.S.C. § 3729(a)(1). The *qui tam* provisions of the FCA, codified primarily in § 3730, enable a private person, called a relator, to bring an FCA action "for the person and for the United States Government." 31 U.S.C. § 3730(b)(1). *See generally United States ex rel. Radcliffe v. Purdue Pharma, LP*, 600 F.3d 319, 321 n.1 (4th Cir. 2010) (describing history and purpose of the FCA). The Government must be given an opportunity to intervene in the action, *see id.* § 3730(b)(2), but if the Government declines to intervene, "the person bringing the action shall have the right to conduct the action." *Id.* § 3730(b)(4)(B).

This appeal presents an issue of first impression for this Court: whether the right to "conduct" a *qui tam* action includes the right to settle the case, subject only to reasonable objections by the Government as the real party in interest. The Government contends that has an absolute and unreviewable right to veto any settlement reached between a relator and a defendant in a declined *qui tam* action. J.A. 588. According to the Government this unreviewable veto power is conferred by § 3730(b)(1), which provides that a *qui tam* action "may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting."[1] If the

---

[1] The complete text of § 3730(b)(1) reads:

> A person may bring a civil action for a violation of section 3729 for the person and for the United States Government.

3

Government decides to withhold consent, even on an arbitrary or unreasonable basis, there is nothing the parties or the district court can do about it—the litigation must continue.

---

The action shall be brought in the name of the Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.

## STATEMENT OF THE CASE

Defendants-Appellees ("Agape") are affiliated entities that operate healthcare facilities throughout the state of South Carolina. J.A. 469. During the time relevant to this litigation, Agape offered a broad range of services including assisted living, skilled nursing, rehabilitation services, and home care for seniors. This litigation, however, is concerned only with Agape's provision of hospice services to Medicare beneficiaries.

This *qui tam* action was filed by two former Agape employees, Brianna Michaels and Amy Whitesides (collectively, "Relators" or "the *Michaels* Relators"), who worked at an Agape facility in Rock Hill, South Carolina. J.A. 49-50. Relators assert numerous causes of action, but their central allegation is that Agape fraudulently billed Medicare for hospice services that were actually provided but were not medically necessary.[2]

### A.    The Medicare Hospice Benefit.

The Medicare Hospice Benefit was established to provide hospice care to terminally ill beneficiaries. Before a Medicare beneficiary may be placed on hospice care, the patient's attending physician and either the hospice medical director or a hospice physician must certify that, in their clinical judgment, the patient is terminally ill, *i.e.*, the patient "has a medical prognosis that the individual's life expectancy is 6 months or less." 42 U.S.C. § 1395f(a)(7)(A)(i) (eligibility requirements); 42 U.S.C. § 1395x(dd)(3)(A) (definition of "terminally

---

[2] Relators' theory is that Agape stood to gain financially by keeping patients on higher levels of care than they were eligible for. *But see* J.A. 105-106.

ill"). *See generally* Ctr. for Medicare & Medicaid Servs., Medicare Benefit Policy Manual Ch. 9 ("Manual"), § 10.[3] Certification for hospice eligibility is thus "based upon a physician's subjective clinical analysis" involving "a complex assessment influenced by the unique facts and circumstances associated with that individual." J.A. 283. The determination that a patient is terminally ill may be based on a single diagnosis, a combination of illnesses, or even without a specific diagnosis. J.A. 284; Manual § 10. After being admitted to hospice care, the patient's eligibility for hospice must be recertified every 60 or 90 days. *See* 42 U.S.C. § 1395f(a)(7)(A)(ii). However, there is no limit to the amount of time a patient can spend in hospice care. *See* Manual § 10 ("Predicting life expectancy is not always exact. The fact that a beneficiary lives longer than expected in itself is not cause to terminate benefits.").

There are four levels of hospice care:

- **Routine care** is provided in the patient's home or in a long term care facility, and may entail services from a hospice nurse, chaplain, social worker, or home-health aid. *See* Manual § 40; J.A. 285.

- **General Inpatient ("GIP") care** is hospice care that is provided in an inpatient setting "when the patient's medical condition warrants a short-term inpatient stay for pain control or acute or chronic symptom management that cannot feasibly be provided in other settings." Manual § 40.1.5.

- **Respite care** is short-term inpatient care, provided for the purpose of relieving family members or others caring for the patient at home. *See* Manual § 40.2.2.

---

[3] Additionally, "[a]n individual (or his authorized representative) must elect hospice care to receive it." Manual § 10.

- **Continuous home care** is home-based, 24-hour care by a hospice nurse during "a period of crisis" when continuous nursing care is needed "to achieve palliation or management of acute medical symptoms." Manual § 40.2.1.

*See also* J.A. 285-286. Determining whether a patient is eligible for hospice services, and the appropriate level of care, requires the certifying physician to consider "the patient's diagnosis, conditions, medical history, the nature or amount of care required, and many other factors." J.A. 287.

## B.    Relators' Allegations.

As noted above, Relators allege that Agape submitted claims to Medicare for hospice services (primarily, routine hospice and GIP care) that were false because the patient either was not eligible for hospice services, or was not eligible for the level of services provided. Under this general umbrella, Relators alleged several specific fraudulent practices:

- Patient certifications were not signed, or were not timely signed, by physicians;

- Certifications did not explicitly state that a patient's medical diagnosis qualified the patient for hospice care;

- Physicians signed hospice certifications without having seen the patient;

- Hospice certifications did not accurately reflect the treating physician's assessment;

- Nurses were instructed to put negative information on patients' charts or to admit patients to hospice or GIP services that were unnecessary.

J.A. 266.

7

C.    **Filing, Investigation, and Dismissal of** *Rush* **Complaint.**

Relators filed their complaint under seal on December 7, 2012. J.A. 14; *see* 31 U.S.C. § 3730(b)(2) (requiring *qui tam* complaints to be filed under seal). The Government declined intervention on March 5, 2013, J.A. 72, and the district court unsealed the complaint two days later, J.A. 74. The following week, a second *qui tam* action, captioned *United States ex rel. Rush v. Agape*, D.S.C. No. 3:13-cv-00666, was filed under seal. Similar to the complaint in this case, the *Rush* complaint alleged that Agape had inappropriately certified patients for routine hospice or GIP services that were not medically necessary. J.A. 229-230. At the Government's request, the district court partially lifted the seal in the *Rush* case, allowing the Government to share the complaint with the *Michaels* Relators. J.A. 223.

The Government eventually declined to intervene in the *Rush* case, but only after conducting a 13-month-long investigation of Agape. J.A. 502-503 (describing investigation). During that time, Agape produced roughly 400,000 pages of documents in response to civil investigative demands (CIDs) authorized by the FCA, J.A. 654, and Government attorneys interviewed some 55 individuals, J.A. 545. Much of the information gathered by the Government during its investigation of the *Rush* complaint was provided to counsel for the *Michaels* Relators. J.A. 442.

By order dated August 18, 2014, the district court ruled that the Relators in this case were the first to file as to all claims, and accordingly dismissed the *Rush* complaint. J.A. 222-38.

### D.    The Statistical Sampling Issue

Although Relators worked at only a single Agape facility in the Upstate of South Carolina, they asserted FCA violations against Agape facilities in every corner of the state. J.A. 123. Furthermore, Relators asserted multiple forms of misconduct, J.A. 266, occurring over a period of nearly ten years, J.A. 584. Consequently, Relators' allegations encompassed large numbers of patients and claims. In its certification order, the district court estimated that during the time frame alleged by Relators, Agape submitted 53,280-61,643 claims for 10,166-19,820 patients. J.A. 470. Importantly, however, Relators have *never* asserted that all of the claims submitted by Agape during the relevant period were false. J.A. 339 ("It's not our allegation that every single [hospice] admission by Agape is a false claim.").

As the deadline for naming their experts approached, Relators sought permission to employ statistical sampling to prove liability and damages. J.A. 239. Agape opposed the use of statistical sampling, noting that determining eligibility for hospice care requires an exercise of subjective clinical judgment that takes into account a myriad of facts and circumstances unique to each patient. J.A. 264. Following briefing by the parties and oral argument, the district court agreed with Agape that Relators could not use statistical sampling to prove their case. J.A. 422.

### E.    Settlement and Government Veto.

This ruling left the parties and the district court the question of how to try the case. The parties and the district court recognized that each patient's medical condition and eligibility for hospice services would have to be individually litigated. J.A. 218. Since Relators did not claim that every claim submitted by Agape was false, however, as an initial step Relators would need to have a medical expert review every patient's file to determine whether, in the expert's view, that patient had been eligible for the care provided. J.A. 469-470. Relators claimed that their experts estimated that it would take between four and nine hours to review each patient's chart, at a rate of $400 per hour. J.A. 470. Thus, Relators opined that simply identifying claims for trial could cost more than $30 million. J.A. 470.

The district court suggested a bellwether trial of a limited number of claims. J.A. 338. Agape objected, arguing that a meaningful bellwether could not be conducted unless Relators first identified which claims they contended were false. J.A. 342-343. Ultimately, however, the district court scheduled an "informational bellwether" trial for May 2015. J.A. 380. The Relators selected 95 patients for the bellwether trial, later reducing this number to 38. J.A. 471.

During the midst of these developments, the parties mediated the case three times. The first mediation, on November 25, 2014, was attended by Relators, Agape, and the Government, and was unsuccessful. J.A. 471-472. A second mediation was conducted by United States Magistrate Judge Mary

Gordon Baker on January 8, 2015, again involving Relators, Agape, and the Government. *Id.* Again, the negotiations were unsuccessful. *Id.*

A third mediation occurred on January 18, 2015, again conducted by Magistrate Judge Baker. J.A. 472 At her suggestion, the Government was not invited to participate. J.A. 507. This mediation resulted in a negotiated settlement, in which Agape agreed to pay ▮▮▮▮▮▮ in exchange for release of all claims in the second amended complaint.[4] J.A. 445, 586.

Shortly after being notified of the settlement, the Government informed Relators and Agape that it would not consent to the settlement. The Government's position was that the value of the case was at least ▮▮▮▮▮▮ and, therefore, that the agreed-upon settlement amount was too little to justify a release from all claims in Relators' second amended complaint.[5] J.A. 472. As the district court observed, however, the Government's valuation was not based on any analysis of the actual claims:

> The Government arrived at its potential recovery figure by using an 'error rate' in the '20-60% range' derived from an

---

[4] The settlement agreement initially contemplated that Agape would be ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮" J.A. 738. At a subsequent hearing, Agape agreed that ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ J.A. 602.

[5] During the district court proceedings, the Government repeatedly asserted that Agape sought a release for "$225 million worth of claims." J.A. 584. This is simply not true. $225 million represents the entire amount of Medicare reimbursements to Agape during the relevant period. *Id.* But Relators have never asserted that every claim submitted by Agape was false, J.A. 339, and consequently there has *never* been "$225 million worth of [allegedly false] claims" at issue in this case.

> expert review of what the Government refers to as 'cherry picked' claims. While the Government's methodology for evaluating this case is not altogether clear to this Court, suffice it to say that the Government has used some form of statistical sampling extrapolated to the universe of potential claims in its damages calculation.

J.A. 472-473. Relying on 31 U.S.C. § 3730(b)(1), the Government contended that its objection to the settlement was not reviewable by the district court. J.A. 473.

Relators, Agape, and the district court thus found themselves at an impasse: Relators and Agape had reached a mutually agreeable settlement based on valuations of experienced litigators who were familiar with the case and whose valuation took into account the effect of the account the district court's ruling on statistical sampling. The district court, having presided over the case for 2½ years, was inclined to approve the settlement. But the Government, having valued the case using "some form of statistical sampling," J.A. 473, was refusing to consent to the settlement.[6] After extended efforts to reach a compromise with the Government were unsuccessful, Agape moved to enforce the settlement agreement. J.A. 472. Agape's motion recognized the Government's right, as the real party in interest, to interpose reasonable objections to settlement agreements in *qui tam* cases. J.A. 476. Agape argued, however, that the Government's objection in *this* case was *not* reasonable, in part because it was based on a valuation derived from some form of statistical

---

[6] The Government has refused to disclose the basis for its valuation of the case. J.A. 625.

analysis, which the district court had ruled was inappropriate for the case. J.A. 476.

After receiving briefs and conducting hearings on the issue, the district court determined that "a compelling case could be made here that the Government's position is not, in fact, reasonable." J.A. 477. Nevertheless, the court felt "constrained to deny the motion to enforce the settlement" based on the plain text of § 3730(b)(1). J.A. 476.

The district court went on to certify for interlocutory appeal both the question of whether the Government has an unreviewable veto right over all *qui tam* settlements, and whether the Relators should be permitted to use statistical sampling to prove liability and damages. J.A. 486. Agape petitioned for review of the settlement issue, and the Relators petitioned for review of both issues. This Court granted both petitions, leading to this interlocutory appeal. J.A. 577.

## SUMMARY OF ARGUMENT

Neither Agape nor the Relators wish to continue litigating this case. Having evaluated the relative strengths of their positions and the cost of proceeding to trial, the parties agreed on a settlement that results in a substantial payment to the Government. The Government plainly is entitled to object to this settlement. *See Radcliffe*, 600 F.3d at 328 ("Section 3730(b)(1) manifests Congress' express intent to prohibit a relator's unilateral settlement of FCA claims, absent the government's consent, once a suit has been filed.") The question presented by this case is whether, as the Government contends, § 3730(b)(1) gives it an absolute and unreviewable power to veto any *qui tam* settlement, thereby forcing the parties to continue litigating. *Cf. United States ex rel. Summit v. Michael Baker Corp.*, 40 F. Supp. 2d 772, 775 (E.D. Va. 1999) ("The Government has tied the relator's hands behind his back, not allowing him to settle the claims or to dismiss the claims, yet refusing to proceed with the claims on its own.").

The False Claims Act simply does not give the Government this kind of power. Rather, an appropriate application of the rules of statutory construction demonstrates that while the Government's consent is required before a *qui tam* case can be voluntarily dismissed, consent cannot be arbitrarily or unreasonably withheld. Further, it is the role of the district court, which also must consent to the voluntary dismissal of a *qui tam* action, to determine whether the Government's objection is reasonable.

14

Furthermore, an absolute and unreviewable veto power is not necessary to protect the Government's interest in *qui tam* cases. In numerous other contexts, district court judges assess settlement agreements and consent decrees to ensure those agreements are fair, adequate, and protective of interested parties and the public. Moreover, the FCA plainly provides for this type of review by requiring the district court's consent to any voluntary dismissal of *qui tam* litigation. *See* 31 U.S.C. § 3730(b)(1) ("The action may be dismissed only if the court … give[s] written consent to the dismissal[.]"). This mechanism protects the Government from unreasonable settlements while simultaneously protecting relators and defendants from unreasonable refusals to consent by the Government.

# ARGUMENT

## I.    STANDARD OF REVIEW

The interpretation of 31 U.S.C. § 3730(b)(1) presents a question of law, which is reviewed *de novo. See O.S. v. Fairfax County Sch. Bd.*, 804 F.3d 354, 357 (4th Cir. 2015).

## II.    SECTION 3730(B)(1) DOES NOT GIVE THE GOVERNMENT ABSOLUTE AND UNREVIEWABLE AUTHORITY TO VETO A SETTLEMENT IN A DECLINED *QUI TAM* ACTION.

As noted above, this appeal concerns the scope of the Government's authority, after declining to intervene in a *qui tam* action, to block a settlement negotiated between the relator (who is entitled, under the FCA, to conduct the action) and the defendant. The Government is the real party in interest in *qui tam* litigation. *See United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 50 (4th Cir. 1992). Accordingly, Agape has never disputed that the Government has a right to object to settlements that are unreasonable or unfair. J.A. 603 ("[W]e also agree on another thing with the government, and that is that they have a right to weigh in and they have a right to object to this settlement."); J.A. 613. The Government contends, however, that its statutory right to withhold consent to dismissal is not limited to *reasonable* objections, but instead is "an unreviewable veto right over settlements." J.A. 588.

The circuit courts of appeals are divided on this question. The first federal appellate court to address this issue was the Ninth Circuit, in *United States ex rel. Killingsworth v. Northrop Corp.,* 25 F.3d 715 (9th Cir.1994). The court

noted that over time, Congress had increased the Government's ability to insert itself into *qui tam* cases, while simultaneously increasing the incentives for private litigants to carry through with declined *qui tam* actions. *See id.* at 721. In view of this evolution, the court held:

> Congress' intent to place full responsibility for False Claims Act litigation on private parties, absent early intervention by the government or later intervention for good cause, is fundamentally inconsistent with the asserted "absolute" right of the government to block a settlement and force a private party to continue litigation.

*Id.* at 722. Additionally, the court concluded that an absolute governmental veto "must be rejected as contradictory to the express language of § 3730(b)(4)(B), which gives the *qui tam* plaintiff 'the right to conduct the action,'" a right that necessarily includes the right to settle the case. *Id.*; *accord* 31 U.S.C. § 3730(d)(2) (providing for a monetary award in declined *qui tam* cases to "the person bringing the action or *settling the claim*" (emphasis added)).

Notwithstanding its rejection of the Government's claim to absolute veto authority, *Killingsworth* held that "[t]he government, though it chooses not to fully intervene in the action, retains the right, upon a showing of good cause, to object to a proposed settlement." *Id.* at 723. However, the Ninth Circuit rejected the notion that this right flows from § 3730(b)(1). While recognizing that the FCA has always required the consent of the Government and the court in order to dismiss a *qui tam*, the court held that "[t]he format and intent of the amended statute … do not preserve the government's absolute right to bar a

dismissal … except during the first sixty days plus any extension granted" under § 3730(b)(2). *Killingsworth*, 25 F.3d at 722.[7]

Prior to the Ninth Circuit's decision in *Killingsworth*, the Second Circuit had examined the scope of the Government's authority under § 3730(b)(1) and had reached a similar conclusion. *See Minotti v. Lensink*, 895 F.2d 100 (2d Cir. 1990) (per curiam). In that case, the defendants sought dismissal of a *qui tam* action on the basis of the relator's failure to comply with the district court's discovery orders. In opposing the motion, the relator argued, in part, that the court could not dismiss the case without first obtaining the Government's consent under § 3730(b)(1). *See id.* at 103. Rejecting this argument, the Second Circuit reasoned that the original statutory phrasing, requiring governmental consent before a *qui tam* was "withdrawn or discontinued," "clearly applied

---

[7] Although no other circuit court of appeals has followed *Killingsworth*, a number of district courts have agreed with its holding. *See, e.g.*, *United States ex rel. Osheroff v. MCCI Group Holdings, LLC,* 2013 WL 3991964, at *7 n.1 (S.D. Fla. Aug. 2, 2013) (enforcing settlement agreement over Government's objection and, after "review of the split of authority," finding "the approach taken by [*Killingsworth*] to be most consistent with the statutory scheme as a whole"); *United States ex rel. Fender v. Tenet Healthcare Corp.*, 105 F. Supp. 2d 1228, 1231 (N.D. Ala. 2000) ("The Government cannot force contractor and former employee to continue litigation by refusing to consent to settlement … The Justice Department has no right to nullify a settlement in a case in which it is not a party."); *United States ex rel. Hullinger v. Hercules, Inc.,* 80 F. Supp. 2d 1234, 1240 (D. Utah 1999) ("Granting the government an absolute right to prevent the consummation of a settlement, by withholding its consent, would appear to be inconsistent with granting the relator the right to conduct and settle the suit."); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v Provident Life and Acc. Ins. Co.*, 811 F. Supp. 346, 347 (E.D. Tenn. 1992) ("The decision by the Attorney General not to intervene in and conduct the lawsuit is tantamount to consent by the Attorney General to have the action dismissed.").

only to cases in which a plaintiff, purportedly representing the interests of the United States, sought to withdraw an action before the United States had an opportunity to assess its merits or intervene in its conduct." *Id.* However, "[o]nce the United States formally has declined to intervene in an action … little rationale remains for requiring consent of the Attorney General before an action may be dismissed." *Id.* at 104.

On the other side of the divide are the Fifth and Sixth Circuits, both of which have held that the Government has an absolute and unreviewable right to veto any settlement in a declined *qui tam* action. *See Searcy v. Philips Electronics of N. Am. Corp.,* 117 F.3d 154, 159 (5th Cir.1997); *United States v. Health Possibilities P.S.C.*, 207 F.3d 335, 341-42 (6th Cir. 2000).[8] Both courts rejected the Ninth Circuit's conclusion that over time, amendments to the FCA had changed the meaning of § 3730(b)(1)'s consent requirement. *See Searcy*, 117 F.3d at 159; *Health Possibilities*, 207 F.3d at 342. Less persuasively, both courts asserted that absolute veto authority in the Government's hands did not meaningfully limit the relator's statutory right to conduct a *qui tam* action after the Government has declined to intervene. *See Searcy*, 117 F.3d at 160 ("A

---

[8] It is worth noting that the settlements in both cases were patently *un*-reasonable. In *Searcy*, for example, the settlement purported to release not only the claims actually brought by the relator, but also from "all claims … which *could have been asserted*" by the relator.[8] *Searcy*, 117 F.3d at 155. Even more egregiously, in *Health Possibilities* the settlement allocated no money to the *qui tam* claim but nevertheless released not just the relators' claims, but also of "all claims 'of any … kind or nature whatsoever'" related to the defendant's submissions under Medicare or any other federal health care reimbursement program. *Health Possibilities*, 207 F.3d at 337.

19

relator has 'conducted' an action if he devises strategy, executes discovery, and argues the case in court, even if the government frustrates his settlement efforts."); *Health Possibilities*, 207 F.3d at 341 (agreeing with *Searcy*).

The Fifth and Sixth Circuits correctly concluded that § 3730(b)(1) does not cease to apply simply because the Government has declined to intervene and the right to conduct the action has vested in the relator. As this Court recognized in *Radcliffe*, "Section 3730(b)(1) manifests Congress' express intent to prohibit a relator's unilateral settlement of FCA claims, absent the Government's consent, once a suit has been filed." *Radcliffe*, 600 F.3d at 328. As the Fifth Circuit observed in *Searcy*, the consent requirement in § 3730(b)(1) contains no temporal limitation, and until the 1943 amendments to the FCA, "that sentence served as the government's one opportunity to influence the litigation in case a relator proposed a settlement that might harm the United States." *Searcy*, 117 F.3d at 159.

*Searcy* and *Health Possibilities* erred, however, in concluding that the Government has boundless authority to veto settlements in declined *qui tam* actions. Rather, a correct reading of § 3730(b)(1) recognizes that the Government's consent to a *qui tam* settlement cannot be unreasonably withheld.[9] Rather, the Government's right to withhold consent to a settlement is limited to reasonable objections to the terms of the settlement.

---

[9] Whether the Government has absolute and unreviewable authority to withhold consent to dismissal during the seal period is not before the Court. Nevertheless, common sense dictates that any threshold for reasonableness should be lower during the seal period, when the Government is determining

### A.    Statutory History

In its present incarnation, § 3730(b)(1) provides that a *qui tam* action "may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." 31 U.S.C. § 3730(b)(1). This sentence is a rephrasing of a limitation that has appeared in the FCA from the outset. As initially adopted in 1863, the FCA provided that a *qui tam* action "shall not be withdrawn or discontinued without the consent, in writing, of the judge of the court and the district attorney … setting forth their reasons for such consent." Act of March 2, 1863, § 4, 12 Stat. 696, 698 (1863). The 1863 statute did not appear to contemplate settlement of a *qui tam* action, providing only "[t]hat the person bringing said suit and prosecuting it to judgment shall be entitled to" half of the penalties and damages awarded. *Id.* § 6, 12 Stat. at 698.

At its adoption, the FCA did not permit the Government to intervene in a *qui tam* action brought by a private person. However, a government attorney could serve as the relator, effectively making it possible for the Government to bring a *qui tam* action. *See* Charles Doyle, *Qui Tam: The False Claims Act and Related Federal Statutes*, Cong. Res. Serv. (Aug. 6, 2009), at 5. In 1943, the FCA was amended to permit the Government to bring its own action under the FCA and to intervene in a *qui tam* action brought by a private person. *See* Pub. L. No. 78-213, § 3491, 57 Stat. 608 (1943). The language requiring the court's

---

whether it will intervene, the defendant has not been served with the complaint, and the relator's statutory right to conduct the action has not yet vested.

and the Government's consent to withdrawal or discontinuance of the action remained the same, but the award provision was amended to recognize the possibility of settlement:

> In any such suit when not carried on by the United States as herein provided … the court may award to the person who brought such suit and prosecuted it to final judgment, *or to settlement*, as provided in [§ 3730(b)(1)], [an award] out of the proceeds of such suit or such settlement of any claim involved therein …

*Id.*, 57 Stat. at 609 (emphasis added).

The statutory language was amended to its present form in 1986. At that time, the final sentence of § 3730(b)(1) was revised to read, "The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." Pub. L. No. 99-562, § 3, 100 Stat. 3513, 3514 (1986). The 1986 legislation also modified the first sentence of § 3730(d)(2) to read, "If the Government does not proceed with an action under this section, the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages." *Id.*, 100 Stat. at 3156.

**B.    Properly construed, § 3730(b)(1) does not give the Government an unreviewable right of veto over *qui tam* settlements.**

In determining the meaning of a statute, the Court "must first consider [its] plain language." *Etape v. Chertoff*, 497 F.3d 379, 392 (4th Cir. 2007). The analysis cannot end there, however, because "[s]tatutory construction … is a holistic endeavor." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forests Assocs.*,

*Ltd.*, 484 U.S. 365, 371 (1988). Just as "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme," *id.*, the meaning of a provision that "may seem plain when 'viewed in isolation'" may be revealed as "'untenable in light of [the statute] as a whole,'" *King v. Burwell*, 135 S. Ct. 2480, 2495 (2015) (quoting *Dep't of Revenue v. ACF Indus., Inc.*, 510 U.S. 332, 343 (1994)), or when viewed in conjunction with other laws.

Section 3730(b)(1) proves this point. On its face, § 3730(b)(1) requires, without qualification, governmental consent for any dismissal of a *qui tam* action. Thus, the plain language of the statute would require the district court to obtain the Government's consent before dismissing a *qui tam* action for failure to state a claim, *see* Fed. R. Civ. P. 12(b)(6), or before granting summary judgment to the defendant, *see* Fed. R. Civ. P. 56(c). Such a literal reading of § 3730(b)(1) is obviously untenable because giving the Government veto power over a court's decision to dismiss a claim on its merits would violate the separation of powers. *See, e.g.*, *Searcy*, 117 F.3d at 158.

It is clear, then, that the text of § 3730(b)(1) is not alone sufficient to resolve the issue presented by this appeal. The Court must look to "the statutory language itself, the specific context in which such statutory language is used, and the broader context of the statute as a whole." *R.H. Donelley Corp. v. United States*, 641 F.3d 70, 76 (4th Cir. 2011) (internal quotation marks omitted).

When this task is undertaken, the weakness of the Government's argument becomes clear. In the first instance, § 3730(b)(4)(B) gives the relator in a declined case "the right to conduct the action"—a right which, like the

consent requirement, has been part of the FCA since it was first enacted in 1863. The Fifth Circuit attempted to overcome this conflict in *Searcy*, reasoning that "[a] relator has 'conducted' an action if he devises strategy, executes discovery, and argues the case in court, even if the government frustrates his settlement efforts." *Searcy*, 117 F.3d at 160. But without the right to decide whether to go to trial or settle, the "right" to conduct the rest of the litigation is all but meaningless. *Cf.* Model Rules of Prof'l Conduct R. 1.2(a) ("A lawyer *shall abide by* a client's decision whether to settle a matter." (emphasis added).) Even more importantly, as the district court in this case pointed out, the relator's deep knowledge of the litigation is what makes it possible to "'know when to hold 'em, [and] know when to fold 'em.'" J.A. 477 (quoting Kenny Rogers, *The Gambler*, *on* THE GAMBLER (United Artists 1978)).

Absolute and unreviewable veto authority is also incompatible with § 3730(d)(2), which provides that in declined cases, "the person bringing the action *or settling the claim* shall receive" a percentage "of the proceeds of the action *or settlement*." 31 U.S.C. § 3730(d)(2) (emphasis added). Nor can absolute and unreviewable veto authority be squared with the fact that the FCA "gives the relator himself an interest *in the lawsuit*, … not merely a right to retain a fee out of the recovery." *Vermont Agency for Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 772 (2000) (emphasis in original).

## C. The goals of the FCA can be accomplished without giving the Government unlimited veto authority.

The Government's central justification for absolute and unreviewable veto authority over *qui tam* settlements is that such authority is needed to prevent plaintiffs and defendants from concocting unreasonable settlements designed to deprive the Government of its share of the recovery. *See Searcy*, 117 F.3d at 160 ("[R]elators can manipulate settlements in ways that unfairly enrich them and reduce benefits to the government."); *Health Possibilities*, 207 F.3d at 340 ("[P]rivate opportunism and public good do not always overlap[.]"). This is unquestionably a legitimate concern, as the settlements in *Searcy* and *Health Possibilities* demonstrate. *See* note 7, *supra*.

However, the choice between absolute veto power for the Government and "unilateral and ultimate settling authority" for the relator, *Health Possibilities*, 207 F.3d at 341, is a false one. Even in a declined case, the Government is always the real party in interest, *see Milam*, 961 F.2d at 50, and has the ability, upon on a showing of good cause, to intervene in the action, *see* 31 U.S.C. § 3730(c)(3).

Moreover, the absolute and unreviewable veto power claimed by the Government does not follow from the fact that the Government's consent is always required before a *qui tam* case can be voluntarily dismissed. In asserting this right, the Government overlooks the fact that under § 3730(b)(1), the district court must also consent to voluntary dismissal. *See* 31 U.S.C. § 3730(b)(1) ("The action may be dismissed only if *the court and* the Attorney

25

General give written consent" (emphasis added)). Settled law, however, establishes that when the district court's consent is required to formalize a settlement, the court may only withhold consent for a sufficient reason. *See, e.g.,* *Flinn v. FMC Corp.*, 528 F.2d 1169, 1172-73 (4th Cir. 1975) (discussing review to be conducted by district court before approving settlement of class action); *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist.,* 921 F.2d 1371, 1383-85 (8th Cir. 1990) (holding that a district court is not required to "automatically approve anything the parties set before it," but cautioning that "[j]udges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and counsel" (internal quotation marks omitted; alteration in original)).

The requirement of "consent" in § 3730(b)(1) applies to both the court and the Government. *Accord United States ex rel. Colorado v. Rocky Mountain Gastroenterology Assocs., PLLC*, 2015 WL 3494501, at *2 (D. Colo. June 2, 2015) (finding dismissal appropriate after considering the relator's notice of dismissal, the Government's notice of consent, "the representation of the parties, the Court file, and the applicable rules, statutes, and law"). If "consent" as applied to the district court means consent that is not unreasonably withheld, it must mean the same thing as applied to the Government. *Cf. BankAmerica Corp. v. United States,* 462 U.S. 122, 129 (1983) ("[W]e reject as unreasonable the contention that Congress intended the phrase 'other than' to mean one thing when applied to 'banks' and another thing as applied to 'common carriers,' where the phrase 'other than' modifies both words in the same clause."). Thus,

as a matter of simple textual analysis, the Government may withhold consent to a settlement only if it has good cause to do so. And, in fact, multiple decisions reflect this reading of the statute. *See, e.g.*, *United States ex rel. Luciano v. Pollack Health & Wellness, Inc.*, 2015 WL 2168655, at *2 (D.N.J. Apr. 30, 2015) (recognizing the Government's right to consent to dismissal but rejecting its request that dismissal be with prejudice to the relator); *United States ex rel. McLain v. Flour Enters., Inc.*, 2013 WL 3899889, at *9 (E.D. La. July 29, 2013) ("The Court reserves judgment on Shaw's motion to dismiss [the FCA claim] and orders the United States to provide the Court with written notice of its intent to either object or consent to dismissal, along with the reasons for objecting or consenting."); *United States ex rel. Law v. Spurlock*, 582 F. Supp. 2d 1350, 1355 (N.D. Ala. 2008) (recognizing that "[t]he court's consent [to dismissal] is, of course, just as necessary as is the consent of the Attorney General," and concluding that the Government's justifications for dismissal were "not reasons that this court could conscientiously adopt as reasons for giving consent").

As the real party in interest in *qui tam* litigation, the Government is entitled to ensure that settlements negotiated by relators and defendants are fair to the Government, as well as to the parties. This does not mean, however, that the Government must be given an absolute and unreviewable veto over settlements. Properly construed, the FCA protects the Government's interests, *and* the interests of the litigants, by allowing the Government to block a settlement only upon a showing of good cause.

## CONCLUSION

For the reasons set forth herein, Agape asks the Court to hold that the Government does not have absolute and unreviewable authority to withhold its consent to settlements in *qui tam* cases, and to remand this case to the district court for consideration, in the first instance, of the reasonableness of the Government's objection in this case.

Respectfully submitted,

s/ William W. Wilkins
William W. Wilkins
Kirsten E. Small
Mark C. Moore
William. C. Lewis
Nexsen Pruet, LLC
Post Office Drawer 10648
Greenville, SC 29603
(864) 370-2211
BWilkins@nexsenpruet.com
KSmall@nexsenpruet.com

Deborah B. Barbier
Deborah B. Barbier Attorney at Law
1531 Laurel Street
Columbia, SC 29201
PHONE:  803.445.1032
FACSIMILE:  803.445.1036
dbb@deborahbarbier.com

*Attorneys for Defendants-Appellees*

January 14, 2016
Greenville, South Carolina